Good morning, Your Honor. May it please the Court? Philip Stillman, Stillman Associates for the Appellant David Lasic. Your Honors, I think this case is actually very, very simple. I submit there's two issues. The first is, do you even get to the issue of qualified immunity in this case, given literally the undisputed evidence and findings of the District Court and the evidence submitted that Dana Moreno, as an investigator, lied to the prosecutors, omitted material evidence, hid exculpatory evidence from not only the prosecutors but from the defense attorney, clear violation of Brady and Rule 16 until the day of trial, and only came up with that evidence in response to a motion to dismiss the prosecution for prosecutorial misconduct? So under – I think under the first order of business is, under Barlow and under Smitty, I don't think you even get to the issue of qualified immunity because those omissions at this stage in the proceedings, a summary judgment motion, conclusively establish that the prosecutor was given false information, incomplete information, and not just lack of candor, but material evidence which ended up being a linchpin key in this case. Didn't the prosecutor make an independent evaluation of the case? No, Your Honor. The prosecutor took the statement, the prosecution referral, which was rife with errors and misstatements and omissions, and issued a criminal complaint based on that. Is that – is that what the prosecutor testified to? The prosecutor and her deputy – the AUSA Spangler said that she made an independent review. Well, and if the trial court believed that, were to disbelieve it? No, Your Honor. Do you disbelieve it? The – yes. You need to disbelieve it for a simple reason. That reason is that we're talking about a summary judgment motion here. And in – and at least in cases – Smith v. City of Oakland, for example. If I search the summary judgment record, where do I find that the prosecutor did nothing after saying I made an independent evaluation of the case? Well – I mean, you're just asking me to go 180 degrees on that. No, Your Honor. You're taking – you have to take a look at accrediting all of the evidence that's submitted in favor of the nonmoving party and drawing all inferences in favor of the nonmoving party. And in this particular case, you need look no further than the testimony of the certified law clerk who handled the entirety of the proceedings from the – from the filing of the criminal complaint all the way through and to the end of trial. And that – and the certified law student was responsible directly for all aspects of that preparation and testified that she was lied to by the prosecutor – by Moreno, that she would have done things differently if she had been told the truth. When she testified that Moreno told her that Mr. Lasik never produced the invoices, she told – she testified that Mr. Lasik was not cooperative. She testified that she told the prosecutor – Well – Is witness tampering a subset of obstruction of justice? Are the elements identical? No. I don't – I don't believe the elements are identical. Because Ms. Moreno recommended that the prosecutor charge obstruction of justice. Correct. And the prosecutor says we exercised independent judgment and we ended up charging something different from what Ms. Moreno recommended. Now, if those are not identical or if witness tampering is not a subset of obstruction of justice, how can we possibly conclude that the U.S. attorneys did not exercise independent judgment? Very simply, Your Honor, they took the prosecution referral, which is, at least for the purposes of this record and this proceeding, false. It's a lousy case. It was a lousy case from the beginning. I'm sorry for your client. So you can't – when you go down to – when you take a look at what is required to show a qualified immunity, you have to take a look at the facts that were presented to the prosecutor in making the prosecutorial decision, A, which we have to accept as false. But my point – my point, counsel, is that the best evidence that we have in support of the – of the – AUSA's statement that they exercised independent judgment is the fact that they didn't charge what Ms. Moreno, what the investigator, recommended. They charged something different. They were made aware of the – of the e-mails. They were made aware of them late. And they said they took another look at it and exercised independent judgment not to dismiss the case. Well, that's – that's actually inaccurate, Your Honor, because at the time of the filing of the criminal complaint, they did – they – even though you're correct that they did charge obviously a different – a different crime, the crime they decided to charge was just completely inappropriate because it had – there was no way to prove that they had attempted witness tampering. But that wasn't – that's not Ms. Moreno's problem, is it? It is not Ms. Moreno's problem. But what is Ms. Moreno's problem, Your Honor, is that they – that she submitted literally, for the purpose of this record, a false prosecution referral. And based on those – that false prosecution referral, a decision was made to prosecute. And whether that decision was made to prosecute for obstruction of justice or whether that decision was made erroneously to prosecute for witnessed attempted witness tampering is irrelevant to the issue of whether Ms. Moreno is entitled to prosecutorial immunity as a result of her submission of those false facts, the admission – the false statements, the knowing false statements, the knowing omissions, the failure to include in that disculpatory information. And then if you take from that – so that undermines any kind of exercise of independent judgment under this Court's decisions in Barlow and Smitty and Harper. And the Court has to look at that issue. Then, from taking it from the filing of the criminal complaint forward to prosecution, the e-mails, which became – which clearly I think we can all agree are completely exculpatory, especially in terms of witness tampering, were not produced before – shortly before trial. The – some of them were produced before trial on the day before trial, Friday. The trial on Monday. You say they were completely exculpatory of which charge? Witness tampering or obstruction of justice. Either one. How do the e-mails exculpate regarding witness tampering? Simple. Because it – those witness e-mails show that at the very time that supposedly Mr. Lasik is trying to harass Mr. – Mr. Lilly from – from reporting that he wasn't going to do the – They also show he might have gotten religion after he threatened Lilly, right? No. No. It's – it can't be that way. And the district court went astray because at the – if you take a look at the timing of the e-mails and the explanations given by both Mr. Lasik and Mr. Lilly as to what was going on on that day, the e-mails give you a very specific timeline of what was going on. In other words, before he – Mr. Lasik is trying to contact Moreno before – the note is left giving me these invoices. Mr. Lasik is trying to – tries to contact her. She doesn't return his call. He writes e-mails. Then he goes in and he tells Mr. Lilly, don't contact her or I'll take action because already and that he's already told the prosecutor that he's told Moreno no. It wasn't that he was going to take action against me because of the contact. He was afraid that I was going to say – shoot my mouth off because I was upset. Then you take a look at – after he writes that note, there's more e-mails saying I'm producing the documents, I'm producing the documents on that same day, Your Honor. So I guess it's possible that he could have had religion in the half hour or something after he – after he said that statement, which was just a little snippet. But in – if you have – if you take a look at the course of e-mails on that day, followed by cooperation – Certainly. Lilly took the statement seriously. He made – he made notations in his day book. He did. And explained that in his deposition testimony and in his declaration as to why he did that. And it shows not that he was – because Mr. Lasik had no ability to take action. He was not – he was not in a managerial position which could. And in fact, the – one of the – in answer to your question, Your Honor, one of the classic points here in that day of not getting religion but starting from the very beginning of the day when he finds out about the problem is what does he do right after he's appraised of this problem first thing in the morning by Mr. Lilly? He calls his supervisor, Jim McBroom. He calls his new supervisor, Mr. Hartnett. And he tells him the whole problem with Ms. Marino and the invoices. And he calls the attorney for the Postal Service. Those are completely inconsistent with any kind of intent to tamper with a witness. And in fact, because of the statements – because of the standard rules. Also could be actions to cover over the threat he'd made to Lilly. Made those – but, Your Honor, he made – he did those actions before he even said that to Mr. Lilly. So as soon as he finds out about the problem in the morning, he's having a meeting with Mr. Lilly. Then he goes and makes the report to his supervisor, his new supervisor, and calls the attorney for the Postal Service. Then he sends e-mails. Tries to get in touch with Ms. Marino. Says he's informed all of these people. Then he tells Lilly not to contact him after Lilly comes in and says he wants to tell her a piece of his mind. Then he writes more e-mails that afternoon. So literally the only reasonable inference, and that's all we're talking about here, that can be drawn from that course of events is there is absolutely no possibility that he was – that there was any intent to witness tamper or obstruct justice and it was false. And that is a reasonable inference. And if it's a dispute over what was done, if it's a dispute over state of mind, then it's a jury issue that has to go to the jury. And I think that – and I'd like to save a couple of minutes for rebuttal. But I want to make one other point. The judge also talks about probable cause. And, of course, under Beck, probable cause is the linchpin of this issue. Does Beck help you or hurt you? I think Beck helps us. Because Beck tells us – Is it overrule Smitty? Well, this is not one of those cases I think where you squarely have to face that issue. Because I think Beck makes a compromise between, under a Fourth Amendment analysis, what the – what a plaintiff must show, and by – and trying to reconcile Smitty with – with Hartman. And so I don't think – I'm sorry. I meant – I meant Hartman. I'm sorry. I wasn't talking about Beck. I didn't mean Beck. I meant Hartman. Beck tries to reconcile those two. And I think that under Beck now, all you need show is lack of probable cause under a Fourth Amendment issue. And I submit to Your Honors, this is the epitome of no probable cause. And the judge applied the wrong standard. The judge applied a standard, a civil standard for malicious prosecution, not a criminal standard, which is a – Let's go back to my opening question, counsel. Assuming – let's assume that Smitty 1 has been – has been overruled. That would help you, if Smitty's been overruled, because it eliminates – it eliminates an objection to your – to your recovery. So if all we have to do under Hartman is find a lack of probable cause, the problem is, is that the U.S. attorney charged something different from what Moreno – from what Moreno argued. I – I agree with you, Your Honor. They did. But – but the problem is, what you have to – I think the material difference that we have on this view is what – we have to look at what the prosecutor based that decision on. What are the facts? And the facts – it's not what – it's not what she charged. She reviews a document. She says, oh, I don't think this document really – But they also interviewed witnesses. Not before charging. Well, Moreno did. Moreno interviewed. Didn't disclose any of that correctly. But the U.S. attorney can – can dismiss this case at any time, including when they get all these e-mails dumped on – on Friday. Well, on the first day of trial, after a motion to dismiss for prosecutorial misconduct was filed. That's when they got – they only got a couple of them before. They got the full batch from Moreno after the motion was filed on the first day of trial. And both – both Mr. Wong, who was found to be in reckless disregard of his duties to supervise the law – the law student by the DOJ, and – Is that in the record? It happened in August, Your Honor. Is it in the record? It is not in the record. Okay. And I would move to supplement the record if – because we did just – Well, if you want us to consider it, you'll have to. You'll have to. But you can't – you can't come up here and – I understand, Your Honor. Your Honor, I have a minute left. I'd like to reserve that minute, if possible, to respond to Mr. Chang's argument. Thank you. May it please the Court, Andrew Chang, U.S. Attorney's Office for Dana Moreno. The prosecutors did act independently in this case for several reasons, Your Honor, besides what you've already mentioned. First, AUSA Spangler asked law student Odom to interview witnesses, and not one of them exonerated Mr. Lasik. When did Odom interview the witnesses? After the charging? The record's unclear as to the exact date, but when you look at the reply, Spangler declaration, it said that she had asked Ms. Odom to interview witnesses, and not one of them had exonerated Mr. Lasik. Okay. But we don't – now, I want to make sure I'm – I understand that Spangler asked Odom, did – is the record clear that Odom interviewed the witnesses? Yes. And is it clear at what point she interviewed the witnesses before or after Mr. Lasik was charged? It's not clear at what point, but if you look at Excerpts of Record 559, it does state the number of witnesses interviewed, including Mr. Lilly, including Mr. Ward, including several other mechanics, not one of whom exonerated Mr. Lasik. Second of all, AUSA Spangler, it reviewed the documentary evidence that was submitted, the two diary entries, one from January 4th, 2002, the second from January 8th, 2002, and the third piece, Mr. Ward's little notebook entry that also documented the statement. So Ms. Moreno's prosecutorial referral was one piece of the puzzle. There are several others. There's the Odom interview, the documentary evidence, and finally, Ms. Moreno's turned over from 1996 to 2002, thus stating to the prosecutors that in fact Mr. Lasik had cooperated. Now, later on, the e-mails were turned over prior to trial. We note that because the prosecutors moved in limine to exclude the e-mails. So Mr. Wong, AUSA Norman Wong, who took over the case from Ms. Spangler, and Kristen Odom both had these e-mails prior to trial, and they made an independent decision at that point not to dismiss for some of the reasons that Judge Baya mentioned in terms of the analysis as to why. Let me change the scenario just a little bit, because I want to flesh something out out of Hartman. Let's suppose that Ms. Spangler, Mr. Wong, and Ms. Odom had all the evidence in front of them, okay, that nothing had been without, all of the evidence. Now, if we concluded that that was, that that did not amount to probable cause, what happens to Ms. Moreno in this case? Well, under the Beck decision, Your Honor, which explicitly stated that it did not, that this Court has not overruled Smitty, it suggests that it wasn't necessary to overrule Smitty, suggested that probable cause is the hallmark. If there is, if there was not probable cause, then you move on to the next inquiry in terms of, I imagine, qualified immunity would fall by the wayside as well. But, in fact, what if Smitty is still the law of the circuit? If we found that there was not, in the scenario that I gave you, if we found that there was not probable cause, then the, then Spangler, Wong, and Odom are out under absolute immunity, and Moreno's on the hook. Well, no, Your Honor, because of the second reason that you gave in terms of the different charge that was made. But I, but under the scenario that I gave you, Moreno's on the hook if there's no probable cause. That is correct, Your Honor. Okay. That is correct. All right. Now, what effect does the, does the change in, in charging have to do with this? What's the relationship between obstruction of justice and witness tampering? Are the elements identical, or is one a subset of the other? We would argue that they are different, different elements altogether. When you look at 1512c2, the element is, otherwise obstructs, influences, or impedes any official proceeding or attempts to do so. When you look at the two charges that Ms. Moreno put forth under 18 U.S.C. 1510 and, more significantly, 1505, there were two of them, she states, obstructs or impedes the proper administration of the law under which any pending proceeding is being had before any department or agency of the United States. So there are different charges. It's a further evidence of the independence of AUSA Spangler to not just rubber stamp the decision of Ms. Moreno. Now, counsel, if we, if we, if we thought that we looked at the 1510 and 1505, which are the two charges that were brought against Mr., against Mr. Lysak, is that correct? 1510 and 1505 were what were recommended by Ms. Moreno. 1512. 1512 is the witness tampering. Correct. Okay. So if we, if we were to look at the 1512 charge and we were to exercise our judgment to say there is no question, if this case were brought before us, we would, we would direct a verdict immediately. This is, there's not probable cause here, and this is a very, very poor case. Now, if we brought that, is Ms. Moreno still on the hook? Well, under the current state of the law, she is not under the hook because of the break in causation due to the prosecutorial independence. Under the current framework under Smitty. Under Smitty. All right. Now, what about under Hartman? Well, under Hartman, that's only in the First Amendment context. It has not been extended into the Bivens context.  Let's suppose we extended it. If you extended it, it's unclear whether that by itself breaks the chain. And the reason why is there still has to be a connection between the animus of the investigator and the ultimate action bringing the charges. And we would argue that the actions on behalf of the prosecutors break that link of causation, specifically when they have several acts of interviewing the witnesses via the law student, second, independently looking at the evidence on their own. And the reason why it's important is it certainly should not be the case that if we have aggressive prosecution, we have a prosecutor changing the charge recommended by the independent, by the investigator, that that should somehow increase the liability of the investigator who does not have absolute immunity. And this Court has never so held. And there's a reason for that. But what if we had the same charges that we had here and the same recommendation by Ms. Moreno, but it was clear that Ms. Moreno had fabricated evidence? Well, certainly we would disagree that that's the state of the record in this case, that she fabricated anything. I think there's certainly a dispute as to what was disclosed at a particular point in time. But our contention is that all of the e-mails were disclosed prior to trial, that the prosecutors looked at the e-mails again, independently decided it wasn't enough. In other words, what we're saying is it does not negate probable cause that there was malice on the part of Ms. Moreno. And all the evidence put forth by Mr. Lasik's counsel go to the animus on the part of Ms. Moreno, whether the making up of certain records after the fact, which we maintain did not occur. She documented, you know, certain interviews. But there's nothing in a record that suggests that anything in those records were false. And so this case is different from the cases that have found a lack of prosecutorial independence. Those cases involve falsification of records. They've involved cases where the prosecutors relied only on the report, which is not the case here. Now, counsel, let's turn then straight to the merits. What is the evidence of probable cause here in light of all of the e-mails and all of the evidence that came out? Several points, Your Honor. First, the diary entry of Wes Lilley from January 4th documenting the threat. Second, the diary entry of January 8th documenting two threats by Mr. Lasik. Third, Mr. Ward's note also documenting that he overheard a threat made against Mr. Lilley by Mr. Lasik. Fourth, Lilley's testimony to Agent Moreno before he ends up flipping at trial and testifying the opposite. Fifth, the testimony of Mr. Ward to Ms. Moreno. And finally, the interviews of Ms. Odom, in which not one witness exonerated Mr. Lasik. We would say that any Do we have any notes of Ms. Moreno's or Ms. Odom's interviews? We do not, Your Honor. Okay. And do we have the evidence as to what Mr. Lilley testified to Moreno and what Mr. Ward testified to Moreno? Well, we have the evidence as to what Mr. Ward testified to Ms. Moreno through the documentary evidence that's submitted to record. When you're talking about Lilley's testimony, Ward's testimony, you're talking about that to the grand jury before indictment? There was no indictment here, was there? No. We're talking about a trial. We're talking about several times, Your Honor. First, when Ms. Moreno independently interviewed Ward and Lilley and said that That's not testimony. Those are statements. Correct. They're not under oath and they're not cross-examined. So they're just statements. Correct. However, Ms. Odom also interviewed Mr. Ward and Mr. Lilley. So it's not just one person. We're having two people having conducted these interviews, none of which at that time led to any exonerated statements. What is in the record is an affidavit from Mr. Lilley after the information had been filed, in which he then states that, well, my testimony is going to be different. There's nothing in the record that that affidavit was ever turned over to the prosecutors in this case. Clearly, that would have made a huge difference had they had something under oath in which this witness was going to actually renege on his testimony, you know, given multiple times to individuals confirming that, in fact, he had been tampered with. Your Honors, you had mentioned the fact that I don't know whether you want to get into the effect of Hartman on the analysis. We believe that Smitty should not be overruled, that Beck should not. This Court should follow the path taken by the Beck court, allowing Smitty to continue. Well, wait a minute. The path taken by the Beck court was that it was irrelevant under any standard and under any standard it was satisfied. Is that what you're urging us to do? I'm urging you to, yes, take that path, but explicitly not overrule the Smitty decision. Well, okay. Following Beck would be a matter of saying we don't decide the issue. Fair enough. I mean, I think that would get to the same result. And the reason why is precisely what I mentioned before, is that it doesn't make sense as a matter of law that when independent prosecutors who have absolute immunity are able to change the charge recommended by investigators, that somehow that should increase the exposure of those who don't have absolute immunity. Your Honor, unless you have further questions, I'm willing to submit. Okay. Thank you, Mr. Cheng. Mr. Stillman. A couple of points. Mr. Cheng says there was a dispute as to what was disclosed. End of the question. Once there's a dispute as to what the prosecutors had in their possession, either at charging or at trial, that's a question of fact for the jury that must be determined prior to the determination of what probable cause is. Once you have the factual disputes decided, then you go to probable cause. Now, just to clarify another question, Odom interviewed all the witnesses after the charging decision. The charging decision was November 5. Trial was the end of January under the Speedy Trial Act. And Odom testified that Moreno, even though she interviewed the witnesses, Moreno lied to her about what was said. So, in other words, when she goes to say, Mr. Lilly, did you write this on the calendar? Yes, I did. Thank you. That's not an interview. Ms. Moreno didn't tell her all of the other things. Ms. Odom said, if I had all this information, it would have opened up all new areas of questioning when I was interviewing these witnesses. What else would Ms. Odom have needed in order to make the decision? Well, she would have needed a lot. She would have needed all these witness interviews which materialized after the fact, three weeks after trial, writing all these witness reports to try and get Mr. Lasik fired. She would have needed the e-mails to see all of this. Didn't Ms. Odom have the e-mails prior to trial? No, Your Honor. She did not have the e-mails prior to trial. She had two or three of, like, long series that did not discuss those things that was filed in a motion by Mr. ---- I heard Mr. Chang. I thought I heard Mr. Chang say that they had all the e-mails. They did not. Well, they ---- Ms. Moreno had all the e-mails. The prosecutor specifically denied to Judge Moulds on Monday that they had them. Okay. Counsel, hold on just a minute. Mr. Chang, did the prosecutors have access to all of the e-mails prior to trial? They had access to all of the e-mails that Court of Nopa turned over to them. Okay. That's not my question. Were they missing e-mails that came up? There were e-mails that came to the attention of the lawyers after the trial was completed. There's nothing in the record that suggests that. Okay. There's nothing in the record that suggests that the e-mails were any different from what was disclosed by the criminal defense attorney, you know, trying to get them to dismiss the case and the e-mails that came up at trial. That's simply not true. It's simply a misreading of the record. Then what are we missing, Mr. Stillman? Can you give me the dates of the e-mails that were missing? Well, Your Honor, if given leave I would be happy to submit a letter and I could lay that out with citation to the record of where that is. It's not in your brief? No. The brief shows all of the e-mails, and I'm not sure that it shows specifically the two or three that Mr. Portanova had prior to trial, which he filed in support of the brief, and what was then ultimately turned over. But it said Monday. Can you give me the date of one e-mail that you think is material that was not turned over prior to trial? This would be one that Mr. Portanova doesn't have, is that correct? Yes. These were all e-mails that Mr. Portanova didn't have until Ms. Moreno showed up in court on Monday morning at trial with a notebook, and that's where they were, and it's in Ms. Odom's testimony. But Mr. Portanova had e-mails prior to trial. He was aware of these e-mails. Well, they were authored by Mr. Lasik. Right. So he was clearly. So what material e-mail? Can you give me the date of one or tell me who it was from or who it was to? The material e-mail that he didn't have were on the, I believe it's January 4th. Okay. From Mr. Lasik to Ms. Moreno. And Mr. Lasik didn't have a copy of his own e-mail? That's correct. Because as soon as he was, as soon as he was, the criminal complaint was filed, he was barred from ever going back to his office to get anything. And the only reason we even had any of the e-mails is that he had printed out one or two of them and had them at his house. And that was the only reason, because after that he was barred from getting anything. And Moreno had all of these. And Ms. Odom testified in her deposition that she hadn't, neither she nor Mr. Mulong had those e-mails, had access to those e-mails until Monday when Ms. Moreno showed up in court with all of this new material. And Ms. Moreno lied about it in her deposition. Ms. Odom said she lied about it in her deposition. And she said that if she had had those e-mails and had those interviews and had the truthful information, then she would have opened up completely extra areas of examination during her witness interviews. And if you don't have enough to create an issue of fact of omissions and investigator misconduct under any case law in this circuit, with this set of facts, with the person in charge of handling the investigation saying that she was lied to, that the investigator had a bandana, that if the investigator had given her this information while she was doing the witness interviews, it would have been a completely different situation. And you have to put yourselves as trial lawyers in the prosecutor's minds. Here they are at trial. And all of a sudden, in trial, all of this is coming out. What do you do? And what they did was they pressed forward. And the obstruction of justice charge versus witness tampering, I think it's a subset of those two. And I think that even if it is a subset, whether it's a subset or not is irrelevant to the issue of what false information and omissions were presented and all the way through trial. This is one of those unique cases, Your Honor, which, if there was ever a reason to overrule Smitty, even though I'm not sure it really squarely presents it. I think we understand the Smitty argument. I think you're well over your time. Thank you, Your Honor. And unless you have any other questions, and there is one other correction I would like to make, Your Honor. Mr. Cheng stated that the Mr. Lilly's declaration was not turned over. And Mr. Portanova testified that he got this declaration from Mr. Lilly after the complaint was filed and showed it to Ms. Odom and Mr. Wong how everything was false in the information that was charged that was claimed to be said by Mr. Lilly. And he showed it to them, and his testimony is that they came back to him, members, as the prosecution and said, the investigator said, that's false. He didn't say those things. So they did have access to this contrary information. Yes, Your Honor. And persisted in the prosecution. Yes, because the complaint was November 5th. The declaration was November 21st. I mean, this was rapid. Okay. I think we understand it. Thank you very much for your time, Your Honor. Thank you. Lethe v. Moreno is order submitted.
judges: Beezer, Bybee, Bea